United States District Court
Southern District of Texas
ENTERED
September 29, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MICHEL THOMAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:21-CV-02997** |
| | § | |
| **AMAZON.COM SERVICES, INC. and ANCHOR RISK MANAGEMENT,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michel Thomas worked as an associate at one of Defendant Amazon.com Services Inc.'s ("Amazon") Houston-area warehouses for just over two years. During that time, he was covered by an employee-benefit plan administered by Defendant Anchor Risk Management ("Anchor") and governed by the Employee Retirement Income Security Act ("ERISA"). Thomas suffered three work-related injuries and sought benefits for each under the plan. Anchor denied all three claims, citing different reasons. Thomas also requested leave under the Family and Medical Leave Act ("FMLA"), but Amazon denied that request as well. When Amazon directed him to return to work after his medical restrictions expired, he did not and was fired in September 2019. Proceeding pro se, Thomas filed this lawsuit on September 15, 2021—more than a year after the final benefits denial and nearly two years after his termination.

Both Parties have moved for summary judgment. Amazon and Anchor argue that Thomas's claims are time-barred and fail on the merits. (Dkt. No. 97). Thomas contends that he is entitled to judgment as a matter of law. (Dkt. No. 105).

Before the Court are Defendants' Motion for Summary Judgment, (Dkt. No. 97), and Thomas's Motion for Summary Judgment, (Dkt. No. 105). For the reasons below, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion, (Dkt. No. 97), and **DENIES** Thomas's Motion, (Dkt. No. 105).

## I. BACKGROUND[1]

Amazon hired Thomas as an associate at one of its Houston-area warehouses in August 2017. (Dkt. No. 55 at 2); (Dkt. No. 109 at 6). From that employment relationship, two disputes arose. First, Thomas suffered three workplace injuries between March and May 2019 and claimed benefits under Amazon's employee-benefit plan (governed by ERISA), all of which the plan administrator—Anchor—denied. (Dkt. No. 50 at 2–8); (Dkt. No. 97 at 90, 117, 123). Second, Thomas requested FMLA leave in July 2019, which Amazon denied. (Dkt. No. 97 at 189). Amazon fired Thomas in September 2019 after a month of unexcused absences. (*Id.* at 137). Though these events unfolded concurrently during the summer of 2019, the Court presents the facts underlying Thomas's ERISA claims and FMLA claims separately below for clarity.

[1] Except where noted, this Section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020). The Court has not weighed evidence or made credibility findings. *Id.*

### A. THOMAS'S INJURIES AND DENIED BENEFITS (ERISA)

First, the facts underlying Thomas's ERISA claims. During his employment, Thomas was covered under Amazon's AmazonTXCare Employee Injury Benefit Plan (the "Plan"). (Dkt. No. 109 at 6); (Dkt. No. 50 at 1). The Plan is administered by Anchor and governed by ERISA. (Dkt. No. 55 at 2).

Neither Party has provided a copy of the Plan to the Court. Instead, a Summary Plan Description ("SPD")—a document prepared by Defendants and mandated by ERISA, 29 U.S.C. § 1022—summarizes the Plan's participation criteria, reporting requirements, benefits and exclusions, claims procedures, and other provisions, (Dkt. No. 97 at 58–88). Even so, the SPD recognizes that the Plan's "official terms are set forth in the Plan document" and that, "[i]n the case of any conflict between the terms and provisions of the Plan and the terms and provisions of this SPD, the Plan will control and govern." (*Id.* at 62). The SPD even hyperlinks to the Plan document. (*Id.*).

Between March and May 2019, Thomas suffered three workplace injuries and sought benefits under the Plan for each. (Dkt. No. 50 at 2–8); (Dkt. No. 97 at 90, 117, 123). Anchor denied all three claims for different reasons: the first because Thomas had reached maximum rehabilitative capacity, the second because it was a continuation of the first, and the third because Thomas failed to timely report the injury. (Dkt. No. 97 at 142, 150, 157–58).

#### 1. The First Injury (March 18, 2019)

The first alleged injury happened on March 18, 2019, when Thomas felt a pulling sensation in his left neck and shoulder while lifting a large box. (*Id.* at 106–07, 179). Later

that day, Thomas felt tingling in his left hand as he lifted another box. (*Id.* at 107). Thomas reported the injury the same day and requested an initial medical evaluation. (*Id.* at 90).

Meanwhile, as an accommodation for his reported injury, Amazon referred Thomas to its light-work program. (*Id.* at 92–99, 180–81). Thomas initially declined the assignment but eventually accepted and started his light-work duties around May 6, 2019. (*Id.* at 92–99, 103).

Nearly four months after the initial injury, Dr. Scott Orth conducted an independent medical evaluation of Thomas on July 16, 2019. (*Id.* at 106–13). Dr. Orth concluded that Thomas's complaints resulted from "age-related[,] pre-existing" conditions and that there was "no objective evidence of any aggravation of his pre-existing cervical degenerative disc disease." (*Id.* at 110–11). Dr. Orth determined that Thomas could "return back to full, unrestricted duty" and was "at maximum medical improvement" with "[n]o further treatment . . . necessary to cure, promote recovery, or enhance his ability to return back to work." (*Id.* at 112).

Based on Dr. Orth's evaluation, Anchor denied further disability and medical-expense benefits for the first injury. (*Id.* at 142–43). Anchor determined that Thomas had been cleared to return to work and had reached Maximum Rehabilitative Capacity—defined in the SPD as "the earliest date after which, based upon reasonable medical probability, further material recovery from or lasting improvement to an injury can no longer be reasonably anticipated." (*Id.* at 69, 142–43). According to the SPD's summary

of the Plan's terms, disability and medical-expense benefits end when this threshold is reached. (*Id.* at 69, 71).

The adverse-determination letter for the first injury informed Thomas that he had the right to appeal the decision through the Plan's appeal procedure. (*Id.* at 143). The letter also informed Thomas that if he "receive[d] an Adverse Benefit Determination on Review," he had the "right to bring an action under section 502(a) of [ERISA]." (Dkt. No. 105-9 at 7). The letter then informed Thomas that "[a]ny such ERISA action must be brought no later than one (1) year from the date of the Adverse Benefit Determination on Review." (*Id.*).

**2. <u>The Second Injury (May 6, 2019)</u>**

Thomas's second alleged injury happened on his first day at the light-work assignment, May 6, 2019. (Dkt. No. 97 at 115). Thomas told other Amazon employees that the light-work duties—like putting clothes on hangers—had "exacerbated [his] injuries." (*Id.*).

Anchor denied benefits for the second injury on May 30, 2019. (*Id.* at 150). Anchor determined that the second injury was a continuation of the first injury and was therefore not a new "Accident" as defined by the Plan. (*Id.* at 150–52).

Like the first letter, the adverse-determination letter for the second injury informed Thomas that he had the right to appeal the decision through the Plan's appeal procedure and the right to bring an ERISA action within a year. (*Id.* at 151–52).

**3. Third Injury (May 18, 2019)**

Just 12 days after his second injury, Thomas claims he suffered a third injury on May 18, 2019, when helping a fellow Amazon employee on whom a cabinet had fallen. (*Id.* at 157–62, 185–86). Anchor denied benefits for the third injury, citing the Plan's alleged three-day reporting requirement. (*Id.* at 157–59). Anchor determined that Thomas "did not report [that] this injury was work related until May 29, 2019." (*Id.* at 157). The adverse-determination letter for the third injury contained the same language as the first two letters informing Thomas of his right to appeal and the Plan's alleged one-year limitations period. (*Id.* at 158–59).

**4. Appeals Process**

Having received denials for all three claims, Thomas appealed each adverse determination under the Plan's procedures. (*See id.* at 77–78) (summarizing the Plan's appeals procedure); (*id.* at 145–48, 154–55, 161, 164) (appeals documents). Though Thomas initiated these appeals while still employed, the appeals process concluded several months after Amazon fired him in September 2019. (*See id.* at 164).

The appeals panel upheld the denial of benefits for all three injuries: the third injury, on December 18, 2019, (*id.* at 161); the second, on December 31, 2019, (*id.* at 154); and the first, on March 5, 2020, (*id.* at 164). Amazon and Anchor contend that the Plan's one-year limitations period for Thomas's denial-of-benefits claim runs from these dates. (*Id.* at 11–12).

#### 5. <u>Document Requests</u>

In addition to disputing the denial of benefits, Thomas alleges that Anchor violated ERISA's disclosure requirements by "not provid[ing] all the relevant requested documents and materials." (Dkt. No. 50 at 10) (citing 29 U.S.C. § 1132).

On July 8, 2019, Thomas sent an email to an Anchor employee with the subject line "Give all all [sic] documents and recordings." (Dkt. No. 105-4 at 1). After requesting medical records and other claim-specific documents, the email continues:

> I also want a complete copy of The Plan rules and policy, which I have never received a copy of . . . from Amazon or the Administrator Adjustor[.] [Y]ou all have failed to give me a copy in writing or electronically of The Plan's rules and policy, which means you all failed to give me notice which you all are required to do under ERISA.

(*Id.*). This is the earliest request for the Plan document evident from the record.

At some point later that year, Thomas again requested documents from Anchor as part of his administrative appeal of the benefits denial for the first injury. (Dkt. No. 97 at 147–48). This time, Thomas requested only claim-specific documents, including medical records, interview recordings, and a copy of any contract that Defendants maintained with Dr. Orth. (*Id.*). Thomas did not request the Plan document. (*See id.*). Anchor contends that it received the appeal and request for documents by mail on January 27, 2020. (*See id*. at 8, 147–48).

### B. MEDICAL-LEAVE REQUEST AND TERMINATION (FMLA)

Next are the facts relevant to Thomas's FMLA claims. After two months on company leave, Thomas received a letter from Amazon instructing him to see Dr. Orth for a medical evaluation. (Dkt. No. 105-1 at 1). Soon after, Thomas emailed Amazon's

workers' compensation manager, Dawn Lee, about taking FMLA leave. (Dkt. No. 97 at 130). Lee responded that she did not handle FMLA leave and directed Thomas to contact the proper department to request FMLA leave. (*Id.*).

The day after seeing Dr. Orth—who concluded that Thomas could return to work without restrictions, (*id.* at 112)—Thomas visited another provider, Next Level Urgent Care ("Next Level"), to obtain an FMLA-eligibility certification, (Dkt. No. 105-1 at 6). Next Level certified Thomas to return to work "with restrictions." (*Id.*). The restrictions were set to last until July 30, the date of Thomas's next appointment. (*Id.* at 3).

Thomas apparently sent this certification to Amazon's leave-of-absence team the same day, July 17. (Dkt. No. 97 at 189). Amazon denied Thomas's FMLA request because he "had already used up all of [his] FMLA." (*Id.*). Thomas alleges that this was false. (Dkt. No. 50 at 12).

The denial of FMLA leave coincided with Amazon's instruction for Thomas to return to work. (Dkt. No. 97 at 132). Based on Dr. Orth's conclusion that Thomas could return to work without restrictions, Amazon notified Thomas on July 24, 2019, that he was to return to work the next day. (*Id.*). Thomas responded on July 27, stating that he would not be returning to work because Next Level had placed him on work restrictions until July 30. (*Id.* at 135). As a result, Thomas contends he could not return to work until, at the earliest, July 31. (Dkt. No. 50 at 11).

Thomas did not return to work on July 31. (*Id.*). Instead, he alleges that on August 2, 2019, he went to his work site to activate his work badge so that he could return on August 4, his next scheduled workday. (*Id.*); (Dkt. No. 97 at 191). But Thomas claims

that Amazon employee Raul Hinojosa—whose position with the company is unclear—would not let him return to work. (Dkt. No. 50 at 11); (Dkt. No. 97 at 191). Hinojosa allegedly told Thomas that he had used all his unpaid personal time ("UPT") and needed to contact his case manager to resolve the issue. (Dkt. No. 50 at 11); (Dkt. No. 97 at 191). The record shows no follow-up on this conversation, no efforts to resolve the UPT issue, and no further attempts to return to work in August.

Meanwhile, on July 22, 2019, Amazon had approved Thomas for "Amazon Medical Leave of Absence"—a company leave policy separate from FMLA—which it backdated to cover his absences between June 23 and July 25. (Dkt. No. 105-8 at 2). Thomas requested an extension of this leave on July 31. (*Id.* at 4). Amazon denied that request on September 6, 2019. (*Id.*). The denial meant that all of Thomas's absences between July 31 and September 6 would count against his bank of UPT. (*Id.* at 1). This resulted in a negative UPT balance, which is grounds for automatic termination. (*Id.*). As a result, Amazon fired Thomas, with an effective separation date of September 17, 2019. (Dkt. No. 97 at 137).

### C. PROCEDURAL POSTURE AND REMAINING CLAIMS

Thomas sued Amazon and Anchor on September 15, 2021. (Dkt. No. 1). This court[2] previously dismissed Thomas's state-law breach-of-contract claim as preempted by ERISA. (Dkt. No. 54 at 1–2). Thomas's remaining claims include: (1) wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B) for all three workplace injuries; (2) failure to

---

[2] The Honorable Lynn Hughes then presiding.

provide requested documents under 29 U.S.C. § 1132(c); (3) ERISA retaliation under 29 U.S.C. § 1140; (4) breach of fiduciary duty under 29 U.S.C. § 1109; (5) FMLA interference; and (6) FMLA retaliation. (Dkt. No. 50 at 6–12).

Both Parties have moved for summary judgment on all remaining claims. (Dkt. Nos. 97, 105). Defendants argue that Thomas's claims are time-barred and fail on the merits. (Dkt. No. 97 at 9–19); (Dkt. No. 122). Specifically, they contend that Thomas's ERISA claims are governed by the Plan's alleged one-year limitations period, which they say began running when the appeals panel issued its final decisions between December 2019 and March 2020—well more than a year before Thomas sued in September 2021. (Dkt. No. 97 at 13–15). And they argue, primarily in supplemental briefing, that Thomas was not entitled to benefits. (*See* Dkt. No. 122). Amazon likewise claims that Thomas's FMLA claims are time-barred under the general two-year statute of limitations because any FMLA interference or retaliation occurred in July 2019 when Amazon denied his FMLA request and instructed him to return to work. (Dkt. No. 97 at 9–10). It adds that Thomas cannot show a genuine dispute about essential elements of either claim. (*Id.* at 10–13).

Thomas counters that his claims are timely and that he is entitled to judgment as a matter of law for various reasons. (Dkt. No. 105 at 2–5). Thomas argues that without proper notice of the Plan, he never agreed to the one-year ERISA limitations period; therefore, the Texas four-year statute of limitations for breach of contract should apply instead. (*Id.*). As for his FMLA claims, Thomas contends that the three-year limitations period for willful violations should apply, and alternatively, that his claims accrued upon

his termination in September 2019 rather than the earlier denial of his FMLA request. (*Id.* at 10–12).

The Court held a hearing on the Motions on March 19, 2025. (Dkt. No. 126). There, the Court addressed the deficiencies in the current record—specifically, that the ERISA Plan had not been produced—and asked for supplemental briefing on the issue. (*Id.* at 29–30). Defendants instead briefed the standard of review applicable to ERISA benefits claims and argued that Anchor did not abuse its discretion when interpreting the Plan. (*See* Dkt. No. 122). Thomas objected to the filing as outside the scope of the summary-judgment briefing and the Court's supplemental-briefing request. (Dkt. No. 123 at 1–3). The Plan still is not in the record.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome under governing law. *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548,

2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)). "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). If evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant. *Carr*, 866 F.3d at 601. This means that courts must resolve factual controversies in the nonmovant's favor, "but only

when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

## III. DISCUSSION

### A. ERISA CLAIMS

Thomas brings four ERISA claims against Amazon and Anchor: (1) recovery of benefits, (2) failure to disclose plan documents, (3) retaliation, and (4) breach of fiduciary duty. (Dkt. No. 50 at 2–10). The Court rules as follows.

First, the Court denies summary judgment on Thomas's claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) because neither Party has introduced the actual Plan document into the record. The Court cannot declare the legal effect of a document it has not seen.

Second, the Court denies summary judgment on Thomas's claim that Anchor violated its disclosure obligations under 29 U.S.C. § 1132(c) by failing to produce the Plan document after Thomas's July 2019 request. (Dkt. No. 50 at 10). Thomas emailed an Anchor employee on July 8, 2019, requesting "a complete copy of The Plan." (Dkt. No. 105-4 at 1). Yet it appears that Anchor has never produced a copy of the Plan. *See* 29 U.S.C. § 1132(c)(1) (providing for $100 daily penalties); *see* 29 C.F.R. § 2575.502c–1 (increasing the maximum per diem penalty from $100 to $110). Because the arguments and evidentiary record on this claim are underdeveloped, the Court will defer its decision about whether to impose statutory penalties, and in what amount, until the bench trial.

Third, the Court grants summary judgment for Defendants on Thomas's retaliation claim under 29 U.S.C. § 1140 because the claim merely repackages his denial-

of-benefits allegations, and Thomas offers no evidence for his allegations of separate retaliatory conduct. (Dkt. No. 50 at 8–9).

Finally, the Court grants summary judgment for Defendants on Thomas's breach-of-fiduciary duty claim under 29 U.S.C. § 1109 because ERISA provides other, more specific remedies for the same alleged injuries. (*Id.* at 6).

### 1. <u>Recovery of Benefits Under Section 1132(a)(1)(B)</u>

First is Thomas's claim for benefits under 29 U.S.C. § 1132. (Dkt. No. 50 at 1–8). He seeks judgment on his claim "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Defendants, meanwhile, seek to enforce the Plan's alleged one-year contractual limitations. (Dkt. No. 97 at 13–15). The Parties have not carried their summary-judgment burdens on this claim because the Plan is not in the record.

The Court cannot interpret a document it has not seen. *See Hare v. Pant*, No. 2:22-CV-00189, 2023 WL 3035362, at *2 (E.D. Tex. Mar. 7, 2023). This basic rule applies with particular force in ERISA cases, where the statute requires courts to focus on "the terms of the plan" and mandates that administrators act "in accordance with the documents and instruments governing the plan." 29 U.S.C. §§ 1104(a)(1)(D), 1132(a)(1)(B). "The plan, in short, is at the center of ERISA." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101, 133 S.Ct. 1537, 1548, 185 L.Ed.2d 654 (2013).

In benefits disputes, the Supreme Court has made clear that "the plan" means the actual plan document—not a summary plan description. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 435–38, 131 S.Ct. 1866, 1876–78, 179 L.Ed.2d 843 (2011) (emphasizing that giving

SPDs controlling legal effect would defeat statutory purpose of keeping them accessible summaries); *Manuel v. Turner Indus.*, 905 F.3d 859, 864 (5th Cir. 2018) ("[T]he Supreme Court has construed ERISA § 502(a)(1)(B) narrowly, pointing out that its plain language focuses on the ERISA 'plan' itself." (citing *Amara*, 563 U.S. at 435–36, 131 S.Ct. at 1876–77)); *see also Omega Hosp., LLC v. United HealthCare Servs., Inc.*, No. 3:16-CV-00560, 2020 WL 7049857, at *21–23 (M.D. La. Dec. 1, 2020) (denying motion to dismiss because of an "incomplete record" that included only SPD).

Thus, the Court cannot resolve the Parties' arguments without the Plan. Without it, the Court cannot determine whether Thomas is entitled to benefits "*under the terms of his plan*." 29 U.S.C. § 1132(a)(1)(B) (emphasis added). Nor can the Court evaluate how—or if—the Plan's provisions, including its alleged one-year limitations period, should be enforced. *Heimeshoff v. Hartford Life & Acc. Ins.*, 571 U.S. 99, 108, 134 S.Ct. 604, 611–12, 187 L.Ed.2d 529 (2013) (emphasizing that enforceability of "contractual limitations provisions" in ERISA plans turns "on the written terms of the plan.").

When given the opportunity to clarify the record through supplemental briefing, Defendants instead expanded their defense of Anchor's interpretation of the Plan. (Dkt. No. 122). But the Court cannot evaluate that interpretation—or even determine the applicable standard of review—without the Plan itself. *See Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247–48 (5th Cir. 2018) (en banc) (holding that courts review benefit denials for abuse of discretion only when the plan expressly delegates interpretive authority; otherwise, review is de novo); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 636

(5th Cir. 1992) (holding that discretionary authority must be expressly granted in plan's text).

This is not a case where the SPD serves as the Plan. *Cf. Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*, 858 F.3d 340, 344–45 (5th Cir. 2017). The record confirms that a separate Plan document exists. (Dkt. No. 97 at 62) (stating that the Plan controls over the SPD); (*id.* at 143, 151–52, 158–59) (quoting terms found in the Plan but omitted from the SPD). Nor is this a case where the issue went unnoticed and both Parties treated the SPD as controlling. *Cf. Dudley v. Sedgwick Claims Mgmt. Servs. Inc.*, 495 F.App'x 470, 471 n.1 (5th Cir. 2012) (treating SPD as plan where "both parties rel[ied] on the [SPD] as the governing text" and no "alternative plan document" was evident from the record). On the contrary, Thomas has consistently complained throughout this litigation that he was never provided a copy of the Plan. (Dkt. No. 50 at 10); (Dkt. No. 105 at 3); (Dkt. No. 123 at 13). Rather, this is a case where, for reasons still unexplained (despite the opportunity), the controlling legal document simply has not been produced.

The Court recognizes that ERISA is complex. "As all who wrestle with it know, ERISA is complicated." *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 347 (5th Cir. 2016). But complexity is no excuse for deciding a case on an incomplete record. As proponents of the Plan's terms, the Parties carry the burden to show "beyond peradventure" that the Plan entitles them to summary judgment. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). The Court cannot say "beyond peradventure" that either Party is entitled to summary judgment under the terms of a document it has not seen in full.

2. **Statutory Penalties Under Section 1132(c)**

Next is Thomas's claim for statutory penalties under 29 U.S.C. § 1132(c). (Dkt. No. 50 at 10). The statute imposes potential liability on "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . within 30 days after such request." 29 U.S.C. § 1132(c)(1). The administrator "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal." *Id.*; *see* 29 C.F.R. § 2575.502c–1 (increasing the maximum per diem penalty from $100 to $110). To establish a claim for statutory penalties under Section 1132(c), "a claimant must show that: (1) the administrator was required by ERISA to make available to the participant the information the participant requested; and (2) the participant requested and the administrator failed or refused to provide the information requested." *Delgado v. Citigroup Inc.*, No. 6:06-CV-00039, 2008 WL 548801, at *11 (S.D. Tex. Feb. 26, 2008).

Defendants argue that Thomas cannot recover under Section 1132(c) because the request that Anchor received in January 2020 did not seek documents that ERISA required it to produce. (Dkt. No. 97 at 16–18). They argue that ERISA only requires them to produce formal plan documents, not claim-specific materials like medical records or interview recordings. (*Id.*). This argument overlooks Thomas's July 2019 request for the Plan document itself. (Dkt. No. 105-4 at 1).

On July 8, 2019, Thomas emailed an Anchor employee requesting "a complete copy of The Plan rules and policy." (*Id.*). The email states that Thomas had "never

received a copy" of the Plan from "Amazon or the Administrator." (*Id.*). A later email suggests that Thomas had directed his July request to the correct person. (*Id.* at 2–4).

Section 1024(b)(4) provides that a plan "administrator shall, upon written request of any participant or beneficiary, furnish a copy of," among other things, the "instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). This includes the written Plan document—the foundational instrument under which the Plan is operated. *See Manuel*, 905 F.3d at 871–72 (recognizing that a request for the "formal written and signed plan document" could support liability under Section 1132(c)). The record indicates that Anchor, for reasons still unclear, has never produced the Plan document. As a result, the Court denies Defendants' request for summary judgment on this claim.

The Court also denies Thomas's request for summary judgment on this claim. (Dkt. No. 105 at 22–25). According to "the express terms of § 1132(c), the imposition of any statutory penalty for an administrator's alleged failure to timely furnish plan documents requested by a participant is within the discretion of the district court." *Thomason v. Metro. Life Ins.*, 165 F.Supp.3d 512, 522 (N.D. Tex. 2016) (citing *Paris v. Profit Sharing Plan for Emp. of Howard B. Wolf Inc.*, 637 F.2d 357, 362 (5th Cir. 1981)); *see* 29 U.S.C. § 1132(c)(1) ("Any administrator . . . who fails or refuses to comply with a request . . . may *in the court's discretion* be personally liable . . . ." (emphasis added)). "In making this determination, courts consider (1) bad faith by the administrator, (2) the length of delay, (3) the number of requests, (4) the documents withheld, and (5) the existence of any prejudice to the plan participant." *Thomason*, 165 F.Supp.3d at 522.

While Thomas may have a colorable claim under Section 1132(c), the Parties' briefing largely does not address the relevant standards, and the record contains limited evidence about Anchor's conduct and the circumstances surrounding its apparent failure to respond to the July 2019 request. (*See* Dkt. No. 97 at 16–18); (Dkt. No. 105 at 22–25). For example, the record contains no specific evidence that Anchor received the July 2019 email, no testimony from any Anchor employee explaining the company's failure to respond, and no documentation of Anchor's internal procedures for processing participant requests for plan documents.

With summary judgment granted on the FMLA claims, *see infra* Section III(B), this case will be tried as a bench trial on the ERISA claims. Because Section 1132(c) penalties are discretionary and the Court serves as the factfinder, the Court will defer its determination about whether to impose statutory penalties, and if so, in what amount, until after a more complete development of both the arguments and the record. That said, as the Fifth Circuit remarked in similar circumstances, the Court is "troubled by the lack of evidence in this record that [the plan administrator] *ever* provided [the participant] with the controlling documents for the [ERISA] plan." *Kujanek v. Hous. Poly Bag I, Ltd.*, 658 F.3d 483, 490 (5th Cir. 2011) (emphasis in original).

**3. <u>Retaliation Under Section 1140</u>**

Next are Thomas's claims for retaliation under 29 U.S.C. § 1140. (Dkt. No. 50 at 1–9). The Court grants summary judgment for Defendants on these claims. Most of Thomas's allegations on this point simply reiterate his denial-of-benefits claim, and Thomas has no evidence to support his separate retaliation allegations. (*See id.* at 8–9)

Section 1140 makes it unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right" under ERISA. 29 U.S.C. § 1140. To sustain a claim under this section, "an employee must show: (1) prohibited (adverse) employer action (2) taken for the purpose of interfering with the attainment of (3) any right to which the employee is entitled." *Bodine v. Emps. Cas. Co.*, 352 F.3d 245, 250 (5th Cir. 2003). "An essential element of a 29 U.S.C. § 1140 claim is proof of the defendant's specific discriminatory intent." *Roberts v. Unitrin Specialty Lines Ins.*, 405 F.App'x 874, 882 (5th Cir. 2010) (per curiam) (citation modified) (quoting *Hines v. Mass. Mut. Life Ins.*, 43 F.3d 207, 209 (5th Cir. 1995), *overruled on other grounds*, *Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003)).

Section 1140 "is designed to prevent 'unscrupulous employers from discharging or harassing their employees.'" *Bodine*, 352 F.3d at 251 (quoting *Van Zant v. Todd Shipyards Corp.*, 847 F.Supp. 69, 72 (S.D. Tex. 1994)). To that end, "[c]ourts have held that [Section 1140] does not prohibit 'all employer actions undertaken with an eye toward thwarting the attainment of benefits; only changes in one's employment status cannot stem from benefit-based motivations.'" *Carmouche v. MEMC Pasadena, Inc.*, No. 4:06-CV-02074, 2008 WL 2838474, at *12 (S.D. Tex. July 21, 2008) (quoting *Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 545 (7th Cir. 1994)).

To violate Section 1140, the employer must take an adverse employment action—such as discharging, fining, suspending, expelling, disciplining, or discriminating against the employee—with the intent to interfere with the attainment of ERISA benefits. 29

U.S.C. § 1140. A mere denial of benefits does not suffice. *Hogan v. Jacobson*, 823 F.3d 872, 885 (6th Cir. 2016) (quoting *Custer v. Pan Am. Life Ins.*, 12 F.3d 410, 422 (4th Cir. 1993)).

But a mere denial of benefits is all Thomas alleges. In support of his retaliation claim, he claims that "Anchor and Amazon continued to retaliate against [him] by improperly denying all of [his] claims for filing the third work injury claim." (Dkt. No. 50 at 9). Elsewhere, he alleges that he was "retaliated against by Anchor and Amazon by denying all of [his] claims improperly and in bad faith." (*Id.* at 6). He confirmed in his deposition that the basis for his retaliation claim is the denial of his benefits: "the retaliation claim is that they denied my claims due to the fact that I filed the third work injury claim." (Dkt. No. 97 at 190).

Section 1140 isn't a substitute for a benefits claim under Section 502(a)(1)(B). And even if it were, Thomas has no evidence that Defendants denied his claims for any reason other than their belief that the claims were not covered under the terms of the Plan. (*See* Dkt. No. 97 at 143, 151–52, 158–59) (citing Plan provisions for each denial). So the Court grants summary judgment on Thomas's Section 1140 claim to the extent he alleges retaliation based on the denial of benefits.[3]

[3] To the extent that Thomas alleges ERISA retaliation based on his termination in September, (*see* Dkt. No. 50 at 8–9), Thomas runs into the essentially the same limitations and causality issues as with his FMLA retaliation claim, *see infra* Section III(B)(2); *Lopez ex rel. Gutierrez v. Premium Auto Acceptance Corp.*, 389 F.3d 504, 507 (5th Cir. 2004) (holding that Texas's two-year limitations period for wrongful-discharge claims applies to ERISA retaliation claims). Amazon's stated reason for firing Thomas is that he missed an entire month of work without excuse, and Thomas has no evidence that this reason was pretext. *See infra* Section III(B)(2)–(3).

Thomas also makes other allegations of retaliatory conduct in his complaint, including that Defendants tried to "trick" him into submitting a nonoccupational-injury form and told his medical provider not to treat his third alleged injury. (Dkt. No. 50 at 8–9). Even accounting for the leniency given to pro se filings, the Court can find no evidence in the summary-judgment record that these events occurred as Thomas describes them. The Court thus grants summary judgment for Defendants on Thomas's ERISA retaliation claim.

**4. <u>Breach of Fiduciary Duty Under Section 1109</u>**

Finally, to the extent that Thomas asserts a separate claim for breach of fiduciary duty under 29 U.S.C. § 1109, it fails for similar reasons. "The Fifth Circuit has held that when ERISA provides a 'direct mechanism' to address the injury for which a plaintiff seeks relief, the plaintiff cannot assert a separate ERISA claim for breach of fiduciary duty." *Carter v. Graphic Packaging Int'l LLC*, No. 3:22-CV-05901, 2023 WL 4446656, at *5 (W.D. La. May 31, 2023) (quoting *Swenson v. United of Omaha Life Ins.*, 876 F.3d 809, 812 (5th Cir. 2017)). Here, Thomas's fiduciary-duty claim reprises his other claims for denial of benefits and failure to disclose plan documents. (*See, e.g.*, Dkt. No. 50 at 6) (alleging that Anchor "breach[ed] its fiduciary duty in denying Plaintiff's second work injury [claim]"); (Dkt. No. 105 at 23) (arguing breach of fiduciary duty based on specific statutory violations). Because ERISA already provides a "direct mechanism" for remedying those alleged violations, the Court grants summary judgment on Thomas's breach-of-fiduciary-duty claim under Section 1109. *Swenson*, 876 F.3d at 812.

* * *

In short, the Court denies summary judgment on Thomas's principal ERISA claims for benefits and statutory penalties, finding that neither side has shown entitlement to judgment without the controlling plan document and that the record on penalties is underdeveloped. But the Court grants summary judgment to Defendants on Thomas's other ERISA theories: his retaliation claim under Section 1140 fails for lack of distinct retaliatory conduct, and his fiduciary-duty claim under Section 1109 is foreclosed by more specific ERISA remedies.

The Court turns next to Thomas's claims under the Family and Medical Leave Act.

### B. FMLA CLAIMS

Thomas brings FMLA interference and retaliation claims under 29 U.S.C. § 2615(a)–(b). (Dkt. No. 50 at 10–12). He bases those claims on a supposed connection between two events: Amazon's July 2019 denial of his leave request, which he says was supported by his doctor's work restrictions, (Dkt. No. 97 at 189); (Dkt. No. 50 at 11), and his September 2019 termination for exhausting his unpaid personal time ("UPT"). (Dkt. No. 105-8 at 1).

Both claims fail for the same basic reason: Thomas cannot raise a genuine dispute that his September termination—the only adverse action within the FMLA's two-year limitations period[4]—was caused by Amazon's denial of his leave request.

---

[4] Thomas argues that the FMLA's three-year statute of limitations should apply because Amazon's conduct was willful. (*See* Dkt. No. 105 at 10–12); 29 U.S.C. § 2617(c). To show willfulness, a plaintiff must present evidence that the employer either knew it was violating the statute or acted with reckless disregard for whether it was. *Mozingo v. Oil States Energy, Inc.*, 661 F.App'x 828, 830 (5th Cir. 2016) (citing *Henson v. Bell Helicopter Textron, Inc.*, 128 F.App'x 387, 393

(continue)

**1. Timeliness**

As a preliminary matter, there is a dispute as to whether Thomas's claim is time-barred by the FMLA's two-year statute of limitations. *See* 29 U.S.C. § 2617(c)(1). Amazon denied his leave request in July 2019. (Dkt. No. 97 at 189). It did not officially terminate him until September 17, 2019. (*Id.* at 137). Thomas sued on September 15, 2021. (Dkt. No. 1). Defendants argue that the limitations period began when Amazon denied Thomas's leave request, (Dkt. No. 97 at 9–10); Thomas contends it began when he was fired, (Dkt. No. 105 at 11).

There is a circuit split on this issue. *Compare Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 896 (7th Cir. 2015) *and Reed v. Lear Corp.*, 556 F.3d 674, 681 (8th Cir. 2009) (limitations period begins with denial of leave) *with Butler v. Owens-Brockway Plastics Prods. Inc.*, 199 F.3d 314, 317 (6th Cir. 1999) (period begins at termination if it resulted from the denial); *see also* Note, Sarah H. Lavelanet, *Tick, Tock: Clarifying the FMLA Statute of Limitations for Claims Involving Absenteeism Policies*, 34 St. Thomas L. Rev. 141, 152–57 (2022) (discussing circuit split). The Fifth Circuit has not addressed the issue. *See Evans v. E. Baton Rouge Par. Sch. Bd.*, No. 3:19-CV-00542, 2022 WL 698062, at *6 (M.D. La. Mar. 8, 2022).

The Court need not resolve the question here because Thomas's FMLA claims fail on other grounds. An FMLA interference or retaliation claim based on an earlier denial of leave must show that the denial caused the termination. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90, 122 S.Ct. 1155, 1162, 152 L.Ed.2d 167 (2002) (FMLA interference

(5th Cir. 2005)). Thomas offers only conclusory allegations, without evidence to support a finding of willfulness. (Dkt. No. 105 at 11). The general two-year limitations period therefore applies.

plaintiffs must show "real impairment of their rights and *resulting* prejudice" (emphasis added)); *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 469 (5th Cir. 2021) (FMLA retaliation plaintiff must show that "a causal link exists between the protected activity and the adverse employment action" (quoting *Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165, 170 (5th Cir. 2014)). As explained below, Thomas has not made that showing. *See infra* Section III(B)(2). The record instead reflects that Amazon fired him for missing an entire month of work that was neither excused by company policy nor covered by the FMLA. The Court therefore assumes without deciding that both of Thomas's claims are timely to the extent they are based in some way on his termination (the only relevant event within the limitations period); to the extent they are not, the claims are time-barred.

**2. <u>Interference</u>**

The FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]." 29 U.S.C. § 2615(a)(1). To establish a prima facie case of FMLA interference, a plaintiff must show that: "(1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA." *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017).

A plaintiff must also demonstrate prejudice resulting from the interference—i.e., that the interference caused harm. *Way v. City of Missouri City*, 133 F.4th 509, 524 (5th Cir. 2025) (quoting *Cuellar v. Keppel Amfels, LLC*, 731 F.3d 342, 347 (5th Cir. 2013)). Thomas

tries to make this showing by arguing that Amazon's denial of FMLA leave led to his termination.[5]

But Thomas's FMLA interference claim fails because he has not shown that his FMLA request caused his firing in September. The causal chain breaks with a substantial intervening event: Thomas missed more than a month of work—from July 31 through early September—that was neither covered by company leave nor protected by the FMLA. (Dkt. No. 105-8 at 1). And he has not offered evidence sufficient to raise a fact issue that this extended absence was caused by Amazon's denial of FMLA leave.

a. Timeline

The key events are as follows. Between March 18 and May 18, 2019, Thomas suffered three workplace injuries, each resulting in some time off work. (Dkt. No. 97 at 106–07, 179); (*id.* at 115); (Dkt. No. 105-9 at 21). As a "courtesy," Amazon did not count his absences from March 18 to April 29 against Thomas's UPT. (Dkt. No. 97 at 101). On May 19, Amazon placed him on short-term disability. (Dkt. No. 105-8 at 2).

On July 16, Dr. Scott Orth examined Thomas and concluded that he had reached maximum medical improvement, needed no further treatment, and could work without restrictions. (Dkt. No. 97 at 112). The next day, Thomas visited Next Level and obtained

---

[5] Thomas's pro se briefing leaves unclear whether the alleged "interference" refers to Amazon's denial of his FMLA leave request or his subsequent termination. This distinction matters because courts disagree over whether the interference itself—or merely the prejudice arising from it—must occur within the FMLA's two-year limitations period. *See supra* Section III(B)(1). If the denial of leave constitutes the interference, and interference must itself fall within the statutory period, Thomas's claim would be time-barred. Because the Court assumes without deciding that Thomas's FMLA claims are timely, *see supra* Section III(B)(1), it presumes either that Thomas argues that his termination was the relevant interference or that alleging prejudice within two years suffices.

a certification of FMLA eligibility, authorizing restricted duty through July 30. (Dkt. No. 105-1 at 3–6). He apparently sent the certification to Amazon's leave-of-absence team the same day as part of a formal request for FMLA leave. (Dkt. No. 97 at 189). Amazon denied the request on July 17, allegedly telling Thomas that he had exhausted his FMLA leave.[6] (*Id.*).

On July 22, Amazon approved Thomas for company medical leave, backdated to cover absences from June 23 to July 25. (Dkt. No. 105-8 at 2). Two days later, Amazon informed Thomas that he was cleared to return to full duty on July 25, based on Dr. Orth's evaluation. (Dkt. No. 97 at 132). Thomas refused to return to work, citing the Next Level certification that restricted him from full duty until July 30. (*Id.* at 135). Although Amazon requested that Thomas return to work on July 25, the record shows that Amazon excluded all absences from May 19 to July 30 when calculating Thomas's UPT balance. (Dkt. No. 105-8 at 4). Along with the earlier "courtesy" credit, this meant that Amazon did not count any of Thomas's absences from March 18 to April 29 or from May 19 to July 30 against his UPT when it decided to fire him. (*Id.*).

The Parties agree that as of July 31, Thomas had no active medical restrictions. (Dkt. No. 97 at 191). Thomas alleges that this was the earliest date he could have returned to work. (Dkt. No. 50 at 11).

But Thomas did not return to work on July 31. (Dkt. No. 50 at 11); (Dkt. No. 105 at 9). Instead, Thomas allegedly visited his worksite on August 2 to reactivate his badge

---

6 Thomas claims this was false but offers no evidence to challenge Amazon's calculation. (Dkt. No. 50 at 12).

for his shift on August 4. (Dkt. No. 50 at 11). According to Thomas, Amazon employee Raul Hinojosa blocked the reactivation and told him to contact his case manager because he had missed shifts and had a negative UPT balance. (*Id.*); (Dkt. No. 105–1 at 8). Thomas contends that Hinojosa must have been counting his July 25–30 absences against him because, despite missing work consistently for almost five months, Thomas believes he still had enough UPT to cover the July 31 absence; in other words, Thomas contends that Hinojosa would not have blocked his reactivation had Amazon approved his FMLA request. (Dkt. No. 50 at 11); (Dkt. No. 105 at 9).

The record does not show that Thomas ever followed up. There is no evidence that he contacted his case manager as Hinojosa directed or otherwise tried to clarify his UPT balance or employment status. Instead, he simply did not report to work for the entire month of August. (Dkt. No. 97 at 191); (Dkt. No. 105-8 at 1).

On September 6, Amazon denied Thomas's request to extend his company medical leave. (Dkt. No. 105-8 at 4). The denial meant that Thomas's absences from July 31 to September 6 counted against his UPT balance, which became negative. (*Id.* at 1). This triggered Amazon's automatic termination policy. (*Id.*). Amazon officially fired Thomas on September 17, 2019. (Dkt. No. 97 at 137).

b. <u>Analysis</u>

As explained above, to prevail on either FMLA claim, Thomas must connect Amazon's July denial of FMLA leave to his September termination. *Supra* Section III(B)(1). He cannot.

Thomas admits that Amazon fired him "[f]or going to negative in [his] unpaid time," which "resulted in automatic termination." (Dkt. No. 97 at 191). His own evidence shows that his August absences caused the "negative UPT balance." (Dkt. No. 105-8 at 1). And the same document confirms that Amazon did not count any of the potentially FMLA-covered absences between May 19 and July 30 against his UPT balance, even though it had instructed him to return to work before July 30. (*Id.*).

In short, there is no evidence that any of the UPT-charged absences that led to Thomas's termination were even arguably protected by the FMLA. Amazon did not fire Thomas because of the four workdays he missed between July 25 and July 30—absences Thomas claims were FMLA-covered. It fired him for the 18 workdays he missed afterward, which were outside the statute's protection (because Thomas had no active work restrictions and had not even requested FMLA leave for this period).

In response, Thomas tries to connect his September termination to his allegedly protected FMLA absences in July. Affording his pro se filings the leniency they're due, his theory of causation appears to be this:

1) Amazon wrongfully denied his July 17 FMLA request and improperly required him to return to work before his medical restrictions expired on July 30. (Dkt. No. 50 at 10–11).

2) He had enough UPT to cover his July 31 absence. (*Id.* at 11).

3) When Thomas tried to return to work on August 2, Hinojosa incorrectly told him that he had already gone negative on UPT and needed to contact his case manager. (*Id.*).

4) Hinojosa's mistaken belief was based on miscounting days that should have been FMLA-protected absences. (*Id.*).

5) The interaction with Hinojosa prevented Thomas from returning to work for the remainder of August. (*Id.*).

6) That month-long absence caused his UPT balance to go negative—even accounting for any FMLA leave—which triggered automatic termination. (*Id.*).

7) Therefore, the wrongful denial of FMLA leave set off a chain of events that ultimately led to Thomas's termination.

This theory fails on multiple levels.

To start, there is no competent summary-judgment evidence supporting Thomas's version of events on August 2. Thomas's only evidence of the August 2 encounter is a handwritten note on an otherwise blank page that Thomas attributes to Raul Hinojosa. (Dkt. No. 105-1 at 8). The note is unauthenticated, and an "unverified handwritten statement" lacking any indicia of reliability and is "not competent summary judgment evidence." *Loosier v. Anderson*, No. 3:00-CV-02528, 2002 WL 83757, at *1 n.2 (N.D. Tex. Jan. 14, 2002) (citing *Watts v. Kroger Co.*, 170 F.3d 505, 508–09 (5th Cir. 1999)).

But even accepting Thomas's account of the August 2 encounter as true, it does not raise a genuine dispute as to whether his request for FMLA leave caused his termination. By Thomas's own telling, Hinojosa merely told him to "contact his case manager and get direction from them" due to UPT issues. (Dkt. No. 105-1 at 8); (Dkt. No. 50 at 11). That instruction neither explains nor excuses Thomas's failure to report to work for the entire month of August.

Thomas's inaction after the August 2 encounter further undermines any causal theory. There is no evidence, or even an allegation, that Thomas contacted his case manager, sought clarification, or took any steps to resolve the issue. This evidentiary

silence is especially conspicuous given his demonstrated ability to navigate Amazon's internal processes when requesting leave and benefits. Thomas submitted FMLA paperwork, appealed benefits denials, and corresponded with multiple departments—actions well-documented in emails and letters. (*See* Dkt. Nos. 105-1–105-9). Entirely missing, however, is any evidence that he took similar action in response to the supposed confusion over his UPT in August.

At best, the evidence shows that Thomas was told to contact a case manager and failed to do so. That does not excuse a month-long absence from work. Accordingly, the August 2 encounter, standing alone, does not establish a causal link between his July FMLA request and his September termination for unexcused absences.

In short, Thomas has not raised a genuine dispute that Amazon terminated him because of his FMLA request, rather than because he missed work for all of August. Even assuming he was eligible for FMLA leave on July 17 based on his work restrictions, those restrictions expired on July 30. (Dkt. No. 105-1 at 3–6). After July 30, he missed an entire month of work without excuse, and Amazon fired him for it. (Dkt. No. 105-8 at 1). Thomas has no evidence that this termination was caused by his FMLA request or Amazon's denial of it. His FMLA claims therefore fail. *Thompson v. Kanabec County*, 958 F.3d 698, 708 (8th Cir. 2020) ("An employee's request for FMLA does not insulate [him] from employment decisions that are based on reasons other than FMLA usage."); *Anderson v. New Orleans Jazz & Heritage Festival & Found., Inc.*, 464 F.Supp.2d 562, 570 (E.D. La. 2006) ("[I]f an employer would be justified in terminating an employee for reasons

unrelated to taking leave, the FMLA does not shield the employee from termination . . . .").

### 3. **Retaliation**

Likewise, without a causal connection between the termination and his allegedly FMLA-protected activity, Thomas cannot show that Amazon fired him "because" he engaged in protected conduct as required for a retaliation claim. *Perkins v. Child Care Assocs.*, 751 F.App'x 469, 473 (5th Cir. 2018) ("To succeed on a claim for FMLA retaliation, an employee must show that . . . 'the adverse decision was made because he sought protection under the FMLA.'" (quoting *Acker v. Gen. Motors, LLC*, 853 F.3d 784, 790 (5th Cir. 2017)).

"FMLA retaliation claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework." *Way*, 133 F.4th at 524. "That framework requires the employee first to set out a prima facie case of retaliation, which she may do by establishing that: (1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) a causal link exists between her protected activity and the adverse action." *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016).

If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005). In the third step of the *McDonnell Douglas* framework, the burden shifts back to the plaintiff to show that the defendant's reason is a pretext for retaliation. *Id* at 332–33.

Thomas has established a prima facie case of FMLA retaliation. As for elements one and two, Thomas has shown that he requested FMLA leave on July 17, 2019, and was fired on September 17. (Dkt. No. 97 at 137, 189). At the prima facie stage, an employee can satisfy the causality requirement through temporal proximity alone if the timing is "sufficiently close." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020). The time between Thomas's request and his termination was just under nine weeks, which is sufficiently close to satisfy the causation element of the prima facie case. *See Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (holding that 10-week temporal proximity between protected conduct and allegedly retaliatory action "still fits comfortably within the time period[]" that creates an inference of causation).

The burden shifts to Amazon to articulate a legitimate, non-retaliatory reason for firing Thomas. Amazon's answer is straightforward: after Thomas's work restrictions expired and he no longer had any basis for FMLA eligibility, Thomas missed an entire month of work in August. (Dkt. No. 105-8 at 1). These absences caused Thomas to incur a negative UPT balance, which is cause for automatic termination under Amazon's policies. (*Id.*).

Given that Amazon has offered a legitimate, non-retaliatory reason for firing Thomas, the burden shifts to Thomas to show that this reason is a pretext. *Caldwell*, 850 F.3d at 245. "Pretext can be prove[d] by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 297 (5th Cir. 2024). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."

*Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "The Fifth Circuit has consistently held that temporal proximity alone is not enough to establish pretext." *Thompson v. Harris Ctr. for Mental Health*, No. 4:23-CV-00297, 2025 WL 1424149, at *11 (S.D. Tex. May 16, 2025) (citing *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015)). So Thomas must show that Amazon fired him because of his allegedly FMLA-protected absences in July. As just explained, he has not. *See supra* Section III(B)(2).

## IV. CONCLUSION

For reasons above, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment, (Dkt. No. 97), and **DENIES** Thomas's Motion for Summary Judgment, (Dkt. No. 105). The Court grants summary judgment for Defendants on Thomas's ERISA retaliation and breach-of-fiduciary duty claims and Thomas's FMLA retaliation and interference claims. The Court denies summary judgment on the ERISA denial-of-benefits and document-production claims.

IT IS SO ORDERED.

Signed on September 28, 2025.

Drew B Tipton

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**