United States District Court
Southern District of Texas
**ENTERED**
September 30, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MICHEL THOMAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:21-CV-02997** |
| | § | |
| **AMAZON.COM SERVICES, INC. and ANCHOR RISK MANAGEMENT,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Michel Thomas worked as an associate at one of Defendant Amazon.com Services, Inc.'s ("Amazon") Houston-area warehouses for just over two years. During that time, he was covered by the AmazonTXCare Employee Injury Benefit Plan (the "Plan"), an employee-benefit plan governed by the Employee Retirement Income Security Act ("ERISA"). Amazon served as the Plan Administrator, and Defendant Anchor Risk Management ("Anchor") served as the Claims Administrator. Thomas suffered three work-related injuries and sought benefits under the Plan for each. Anchor terminated his benefits for the first injury and denied his claims for the second and third. After Thomas was released to return to unrestricted duty, Amazon directed him to return to work. He did not, and Amazon terminated his employment in September 2019.

Proceeding pro se, Thomas filed this lawsuit on September 15, 2021—more than a year after the final benefits denial and nearly two years after his termination. He alleges that Amazon violated 29 U.S.C. § 1132(c) by failing to provide him a copy of the Plan or

a Summary Plan Description ("SPD") and that Amazon and Anchor violated 29 U.S.C. § 1132(a)(1)(B) by improperly denying him benefits under the Plan.

Amazon asserts that Thomas's denial-of-benefits claims are barred by the Plan's one-year limitations provision. It also contends that Thomas's document-production claim fails because it provided him a copy of the Plan after he requested it, and that his denial-of-benefits claims fail because the challenged benefits determinations were not arbitrary or capricious. Thomas disputes those contentions, asserting that he never received the Plan and that the reasons given for denying his benefits were inconsistent with the Plan's terms.

## I. FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance of the evidence. Any finding of fact that should be construed as a conclusion of law is adopted as such.

1. On or around August 14, 2017, Defendant Amazon hired and employed Plaintiff Thomas as an associate at one of its Houston-area warehouses. (Dkt. No. 166 at 2); (*see also* Dkt. No. 50 at 1); (Dkt. No. 55 at 2). [Agreed]

2. As an Amazon employee, Thomas was covered under the AmazonTXCare Employee Injury Benefit Plan. (Dkt. No. 184-2 at 5).

3. The Plan contains provisions governing participation and reporting requirements, benefits and exclusions, claims procedures, and other matters related to Plan administration. (*Id.* at 3–5).

4. Amazon is the Plan Administrator of the Plan and Anchor Risk Management is the Claims Administrator appointed by Amazon—that is, the third-party administrator responsible for claims administration under the Plan. (*Id.* at 6, 10); (*see also* Dkt. No. 193 at 32–35).

5. Nicholas Perez is a claims adjuster for Anchor who handled each of Thomas's three claims for benefits arising from the workplace injuries described below.

(Dkt. No. 193 at 21–22). He therefore has personal knowledge of the administration of those claims. (*Id.* at 22).

6. According to Perez, new Amazon employees receive various onboarding documents during orientation and must sign off on those documents before beginning employment. (*Id.* at 91–92, 142).

7. One of those onboarding documents is the AmazonTXCare Employee Injury Benefit Plan SPD. (*Id.*). The SPD provides information about the Plan in language more accessible to a layperson and provides participants or beneficiaries with notice of certain rights under the Plan. (*Id.* at 93–94).

8. Thomas testified that he never received a copy of the SPD before beginning employment with Amazon. (*Id.* at 175–76). Perez admitted that he had no personal knowledge of what documents Thomas received during his onboarding process. (*Id.* at 148).

9. During the course of his employment, Thomas had three workplace injuries and sought benefits under the Plan following each.

### A. THE FIRST INJURY

10. On March 18, 2019, at approximately 11:00 a.m., Thomas was injured at work while lifting a 20-pound box from a conveyor belt. (Dkt. No. 184-12 at 1–2); (Dkt. No. 184-7); (Dkt. No. 193 at 152–53). He felt a pulling sensation in his neck and left shoulder near the base of his neck and along his trapezius muscle. (Dkt. No. 184-12 at 1).

11. Thomas continued working that day. After lifting another heavy box over his head, he experienced tingling in his left hand. (*Id.* at 2). He also experienced throbbing in his eyes. (Dkt. No. 193 at 153).

12. Thomas reported the injury to Amazon the same day. (*Id.*); (Dkt. No. 184-7).

13. Thomas sought medical care from Next Level Urgent Care ("NLUC"), one of three "Approved Providers" Amazon authorized him to see under the Plan. (Dkt. No. 185 at 15–16). NLUC prescribed Thomas muscle relaxants, activity modification, anti-inflammatory medications, and physical therapy. (Dkt. No. 184-12 at 5).

14. NLUC informed Thomas and Amazon that he could return to work with restrictions. (Dkt. No. 185 at 15–16); (Dkt. No. 193 at 153). Those restrictions prevented him from lifting, carrying, pushing, or pulling objects weighing more than five pounds using his left side. (Dkt. No. 185 at 15–16).

15. Thomas began receiving medical and disability benefits under the Plan for his injury. (*See* Dkt. No. 184-18); (Dkt. No. 193 at 95, 99–101). He remained on leave from March 19, 2019, until May 6, 2019. (*See* Dkt. No. 184-12 at 2).

16. As part of his accommodations under the Plan, Amazon referred Thomas to its alternative work program to perform light-duty work. (Dkt. No. 184-8). The assignment required Thomas to work at an off-site location, Pennywise Resale Store ("Pennywise"), sorting, hanging, and organizing clothing and other donations. (Dkt. No. 184-9 at 3).

17. After initially declining the off-site assignment, (Dkt. No. 184-9 at 1), Thomas eventually agreed to begin working at Pennywise beginning on May 6, 2019, (Dkt. No. 184-11).

18. Several months after the injury, Perez directed Thomas to undergo an independent medical examination ("IME") after consulting with and receiving approval from Amazon. (Dkt. No. 193 at 50, 96–99).

19. On July 16, 2019, Dr. Scott Orth, an orthopedic surgeon, conducted an IME of Thomas at his office in Sugar Land, Texas. (Dkt. No. 184-12). Dr. Orth explained that he was conducting an IME and that he "would not become [Thomas's] treating physician or be offering any treatment to him." (*Id.* at 1).

20. In his report, Dr. Orth attributed Thomas's condition to "age-related degenerative changes" that were not "traumatic or acute." (*Id.* at 5). Dr. Orth also concluded that Thomas's symptoms were not caused by the March 18, 2019, incident and stated that Thomas may have been magnifying his symptoms. (*Id.*). Further, Dr. Orth concluded that "[t]here is no objective evidence of any cervical nerve root compression." (*Id.* at 6).

21. Dr. Orth concluded that Thomas had reached "maximum medical improvement" and that "no further treatment" was "necessary to cure, promote recovery, or enhance his ability to return back to work." (*Id.* at 7). As a result, Thomas could return to full, unrestricted duty. (*Id.* at 6–7).

22. Based on Dr. Orth's report, Anchor terminated Thomas's benefits for the first injury effective July 24, 2019. (Dkt. No. 184-18). The termination letter cited Articles 4.5 and 4.6 of the Plan as the basis for the decision and informed Thomas of information and deadlines related to an appeal. (*Id.*).

23. Article 4.5 of the Plan, titled "Disability Benefits," states, in relevant part:

> A Participant is eligible for the Disability Benefits provided that the Participant is Disabled from performing his or her work for the Employer by an Accident, Occupational Disease

> and/or Cumulative Trauma. Such Disability must commence within ninety (90) days of the Accident or Occurrence and be diagnosed by an Approved Provider. . . . Disability Benefits payments are subject to the following limitations:
>
> 3. . . . If the Participant is released to return to work without restriction or to Maximum Rehabilitative Capacity by an Approved Provider, but the Participant does not return to work <u>for any reason</u> Disability Benefits shall cease.

(Dkt. No. 184-2 at 15–16 (emphasis in original)).

24. Article 4.6 of the Plan, titled "Medical Expense Benefits," states, in relevant part:

> A Participant is eligible for Medical Expense Benefits for the amount of Covered Charges that result directly, and from no other cause, from Injury that results from an Accident, Cumulative Trauma and/or Occupational Disease . . . .
>
> The medical care and treatment must be ordered and rendered by an Approved Provider. In addition, the medical care or treatment must be deemed Medically Necessary by the Claims Administrator. . . .
>
> Pre-Certification Requirements for Medical Expenses resulting from an Accident are designed to ensure that Hospital admissions and lengths of stay, surgery and other medical services are medically Necessary by having the Claims Administrator refer the Participant's Claim file to a qualified Approved Provider to determine Medical Necessity . . . .
>
> Medical Expense Benefits shall cease upon the earliest of:
>
> a. The date Maximum Rehabilitative Capacity is achieved.

(*Id.* at 17–18).

25. Amazon instructed Thomas to return to unrestricted work on July 25, 2019. (Dkt. No. 185 at 11).

26. On January 27, 2020, Thomas appealed the termination of his benefits to the Amazon Injury Benefit Plan Committee (the "Committee"). (Dkt. No. 184-19). The Committee denied his appeal on March 5, 2020. (*See* Dkt. No. 184-24).

**B. THE SECOND INJURY**

27. On May 6, 2019, the same day he began work at Pennywise, Thomas suffered a second injury. (Dkt. Nos. 184-13, 184-14). According to the incident report, Thomas was injured while sorting and hanging clothes and stocking items on shelves. (Dkt. No. 184-14 at 1). While performing those tasks, Thomas felt pain in his right hand, numbness in his right thumb and index finger, lower back pain, numbness in his lower buttocks and left hamstring, and intense headaches and dizziness. (*Id.*).

28. Thomas reported the injury to Amazon the same day. (Dkt. Nos. 184-13, 184-14). In an email to several Amazon employees, Thomas characterized the May 6, 2019, event as having "exacerbated [his] injuries." (Dkt. No. 184-13). He also claimed that it caused "increased pain in [his] neck and intensified [his] headache and dizziness, also [his] lower back pain has returned as well as not only the numbness and tingling in [his] left hand finger, it has now moved to [his] right hand thumb numbness." (*Id.*).

29. In a follow-up email on May 16, 2019, Thomas informed Amazon that he considered these to be new injuries and that they had become "more intense and frequent." (Dkt. No. 185 at 63).

30. Amazon authorized NLUC to conduct an IME related to Thomas's second injury. (Dkt. No. 184-14 at 2).

31. On May 30, 2019, Anchor, through Perez, sent Thomas a letter denying benefits under the Plan. (Dkt. No. 184-20). The letter stated that Thomas "did not sustain an injury" and instead "only increased [his] pain from [his] existing injury in [sic] March 18, 2019." (*Id.*). It also informed Thomas of information and deadlines related to an appeal. (*Id.*).

32. The letter cited the Plan's definitions of "Accident" and "Cumulative Trauma" as the basis for the denial. (*Id.* at 2). The Plan defines an "Accident" as:

> [A]n injury to a Participant which: (1) was unforeseen and unexpected; (2) occurred at a specifically identifiable time and place; (3) occurred by chance, unexpectedly, and/or not in the usual course of events; (4) was caused by an external factor associated with Participant's work or with the workplace; (5) resulted directly in Injury to the Participant; (6) occurred in the course and scope of the covered Participant's assigned duties and employment with the Employer; (7) occurred during the pendency of the Plan; and (8) for which medical

> treatment with an Approved Provider under the Plan (not Amcare or other similar arrangements) was initiated within 30 days of the Injury producing event. . . .

(Dkt. No. 184-2 at 5–6). This definition specifically excludes "Occupational Disease or Cumulative Trauma" with limited exceptions. (*Id.*). The Plan defines "Cumulative Trauma" as "damage to the physical structure of the Participant's body occurring as a result of repetitious, physically traumatic activities that occur in the Scope of Employment with the Employer and independent of all other causes. Cumulative Trauma does not include an Accident or Occupational Disease." (*Id.* at 7).

33. Thomas appealed Anchor's denial of benefits for the second injury to the Committee. (Dkt. No. 193 at 116–17, 185–86). On December 31, 2019, the Committee denied Thomas's appeal and upheld the denial of benefits. (Dkt. No. 184-21). The letter included language stating that any ERISA action must be brought no later than one year from the date of the Adverse Benefit Determination on Review, but it did not state the calendar date on which that period expired. (*Id.* at 2).

### C. THE THIRD INJURY

34. On May 18, 2019, while Thomas was working at Pennywise, two cabinets fell onto one of his co-workers. (Dkt. No. 184-15); (Dkt. No. 193 at 167). Thomas assisted her by calling for help and lifting the cabinets off her. (Dkt. No. 184-15); (Dkt. No. 193 at 167).

35. An incident report dated May 18, 2019, on Fort Bend Women's Center letterhead was signed by Thomas and described his assistance during the incident. (Dkt. No. 185 at 69). The report was addressed to Carol Alcorta, Thomas's Pennywise supervisor,[1] and did not mention any injuries sustained by Thomas. (*See id.*); (*see also* Dkt. No. 193 at 171–72).

36. Thomas also sent Amazon an email on May 18, 2019, stating that he would not continue working at Pennywise because of a "very unsafe work environment." (Dkt. No. 185 at 73). Thomas informed Amazon that he filed the Fort Bend Women's Center incident report on the date of the incident and directed Amazon to contact his Pennywise supervisor for a copy. (*Id.*). On June 4, 2019, Thomas forwarded the email to Perez and Anchor. (*Id.*). The email did not mention that Thomas had sustained any injury.

37. On May 29, 2019, Thomas filed an "Associate First Report of Injury" ("FROI") with Amazon in which he stated for the first time that the incident caused him

---

[1] Alcorta was not an Amazon supervisor. (*See* Dkt. No. 193 at 171–72).

to "reinjure [his] neck, hurt [his] back," and to experience "headaches and dizziness more frequently." (Dkt. No. 184-15 at 1).

38. Amazon authorized NLUC to conduct an IME related to Thomas's third injury. (Dkt. No. 184-15 at 2). The authorization identified May 18, 2019, as the date of injury and May 29, 2019, as the date the injury was reported. (*Id.*).

39. On May 30, 2019, Anchor, through Perez, sent Thomas a letter denying benefits under the Plan. (Dkt. No. 184-22). The letter stated that Anchor denied benefits because Thomas failed to report his injuries within the required time frame. (*Id.* at 1–2). As the basis for the denial, the letter cited Article 3.3 of the Plan, titled "Reporting," which provides:

> A Participant must immediately report any Accident (regardless of the nature or severity), Cumulative Trauma or Occupational Disease from a known cause or exposure to his or her manager or other person designated by the Plan Administrator in accordance with the time frames and procedures specified in the Employer's workplace accident and injury policy, as it may be updated from time to time, which is generally no later than the end of the shift <u>and in no instance later than 3 days following the date of Accident</u>. Failure to immediately report an Accident, Occupational Disease or Cumulative Trauma may result in the denial of Benefits and subject the Participant to disciplinary action up to and including termination.

(Dkt. No. 184-2 at 11–12 (emphasis in original)).

40. The letter also informed Thomas of information and deadlines related to an appeal of Anchor's decision. (Dkt. No. 184-22 at 2–3).

41. Thomas appealed Anchor's decision to deny him benefits for the third injury to the Committee. (Dkt. No. 193 at 116–17, 185). On December 18, 2019, the Committee denied his appeal and upheld the denial of benefits. (Dkt. No. 184-23). The denial letter identified three emails Thomas sent in the days immediately following the incident in which he referenced injuries but attributed them to his first injury. (*Id.* at 1–2). The letter did not reference the Fort Bend Women's Center incident report.

42. The denial letter also informed Thomas that he could bring an ERISA action under the Plan. (*Id.* at 2).

43. Thomas presented no evidence at trial concerning damages other than an email indicating that NLUC had placed him on work restrictions through July 30, 2019. (*See* Dkt. No. 185 at 24).

### D. THOMAS'S REQUESTS FOR DOCUMENTS

44. On July 8, 2019, Thomas emailed Amazon and Perez requesting "all the documents in [his] file from the injuries of March 18th, 2019, May 6th, 2019, and May 18, 2019." (Dkt. No. 184-25). He also specifically requested "a complete copy of The Plan rules and policy." (*Id.*).

45. On July 30, 2019, Perez emailed Thomas stating that he had attached a copy of the Plan and the incident reports for Thomas's three injuries. (Dkt. No. 184-3 at 1). The email included four attachments titled: (1) "AmazonTXCare Employee Injury Benefit Plan Document – FINAL 1-11-19.pdf," (2) "mthmasv FROI 05.17.2019.pdf," (3) "mthmasv FROI 05.29.2019.pdf," and (4) "mthmasv FROI 03.18.2019.pdf." (*Id.*).

46. While Thomas received the email, he testified that he was unable to view, download, or otherwise access the attachments, including the Plan. (*See*, *e.g.*, Dkt. No. 193 at 159).

47. Thomas also testified that he called Perez twice to inform him that he could not access the attachments and that Perez agreed to mail them to him but failed to do so. (*Id.*).

48. Perez denied that these phone calls occurred. (*Id.* at 85–86). He also denied that Thomas informed him that he could not access the attachments to the July 30, 2019, email or requested that a copy of the Plan be mailed to him. (*Id.* at 85–86). Perez therefore understood Thomas to have been able to access the copy of the Plan attached to the July 30, 2019, email. (*See id.* at 90). Perez testified that, had Thomas informed him that he could not access the Plan, he would have mailed Thomas a copy. (*Id.*).

49. Thomas and Perez regularly corresponded by email throughout the administration of Thomas's three injury claims and also spoke by telephone about the claims. (*Id.* at 84–86). Perez testified that he regularly communicates with Plan participants or beneficiaries by email and that Anchor regularly sends ERISA plans and related documents by email. (*Id.* at 85).

50. On October 18, 2019, Thomas again emailed Perez asking for "all of the documents and recording, [sic] and medical records, and everything else I am requesting." (Dkt. No. 185 at 30). Thomas also stated that he wanted "all requested documents to be part of all proceedings as it pertains to the denial of [his] work injury claims." (*Id.*). Thomas did not specifically renew his request for a copy of the Plan in the email.

51. Perez responded on October 29, 2019, stating that he would send the complete file for each of Thomas's three claims by email. (*Id.*).

52. On November 1, 2019, Thomas replied that he did not "have the ability to download and print off these documents" and requested that they be mailed to him in hard copy. (*Id.* at 31).

53. Perez confirmed that the documents would be mailed to Thomas that same day by certified mail. (*Id.*). At trial, Perez testified that he understood Thomas's November 1, 2019, email to mean that Thomas had received the requested documents but was unable to print them. (*Id.* at 89).

## II. CONCLUSIONS OF LAW

Based upon the above findings of fact, the record, and arguments of the Parties at the bench trial, the Court enters the following conclusions of law. Any conclusion of law that should be construed as a finding of fact is adopted as such.

### A. DENIAL OF BENEFITS

#### 1. Statute of Limitations

54. Section 502(a)(1)(B) of ERISA permits a participant or beneficiary to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *See* 29 U.S.C. § 1132(a)(1)(B).

55. An ERISA cause of action accrues when a request for benefits is denied. *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 230 (5th Cir. 1997). In the absence of a contractual limitations provision, courts generally borrow the limitations period governing the most analogous state-law claim. *Id.*; *see also Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992). In Texas, the analogous claim is one for breach of contract, which carries a four-year limitations period. *Hogan*, 969 F.2d at 145.

56. An ERISA plan may, however, prescribe a shorter limitations period. "[A] participant and a plan may agree by contract to a particular limitations period [that is shorter] . . . as long as the period is reasonable." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105–06, 134 S.Ct. 604, 610, 187 L.Ed.2d 529 (2013); *see also Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 337 (5th Cir. 2005) ("Where a plan designates a reasonable, shorter time period, however, that lesser limitations schedule governs."). Courts in this district have approved plan language requiring a claimant to file a denial-of-benefits claim within one year or less. *See Nicholas v. KBR, Inc.*, No. 4:07-CV-00657, 2010 WL 11531123, at *7–8 (S.D. Tex. Aug. 24, 2010) (finding that a one-year limitations period was reasonable when the claimant was given prompt notice of the denial and of the limitations period); *Pfifer v. Sedgwick Manag. Servs.*,

*Inc.*, 414 F.Supp.3d 1024, 1034 (S.D. Tex. 2019) (finding a six-month limitations period reasonable); *Rusch v. United Health Grp. Inc.*, No. 2:12-CV-00128, 2013 WL 3753947, at *4 (S.D. Tex. July 15, 2013) (same); *RedOak Hosp., LLC v. GAP Inc.*, No. 4:16-CV-01303, 2017 WL 2936316, at *3 (S.D. Tex. July 10, 2017) (finding a 90-day limitations period reasonable).

57. Article 6.13 of the Plan, titled "Exhaustion of Administrative Remedies," provides:

> No action at law or in equity may be brought to recover Benefits under the Plan until all administrative remedies, including the full Claims and appeal procedures, have been exhausted. If a Participant fails to file a timely Claim, or if the Participant fails to request a review in accordance with the reasonable Claim procedures, such Participant shall have no right of review and shall have no right to bring any action in any court. The denial of the Claim shall become final and binding on all persons for all purposes. **A Participant or Beneficiary who has exhausted the Plan's Claims and Appeals procedures has the right to bring a civil action under Section 502(a) of ERISA provided the civil action is filed within 1 Year after the final determination upon appeal under the Plan's Claims and Appeals procedures.**

(Dkt. No. 184-2 at 32) (emphasis in original). The SPD likewise contains this one-year limitations requirement. (Dkt. No. 184-6 at 22).

58. The Court concludes that the Plan's one-year limitations period is reasonable. *See Heimeshoff*, 571 U.S. at 105–06, 109–10, 134 S.Ct. at 610, 612. That does not end the inquiry, however. Thomas sought disability benefits in connection with each of his three injuries. Under Article 4.5, entitlement to those benefits depended on whether he was "Disabled from performing his or her work" within the meaning of the Plan. (Dkt. No. 184-2 at 15). Those claims are therefore subject to the special procedures governing claims for disability benefits. *See* 29 C.F.R. § 2560.503-1(m)(4); Claims Procedure for Plans Providing Disability Benefits, 81 Fed. Reg. 92316, 92316 n.3 (Dec. 19, 2016).

59. For claims for disability benefits filed after April 1, 2018, an adverse benefit determination on review must describe "any applicable contractual limitations period" governing the claimant's right to bring an action under Section 502(a) and must state "the calendar date on which the contractual limitations period expires for the claim." 29 C.F.R. § 2560.503-1(j)(4)(ii), (p)(3). The regulations applicable to those claims also provide that a plan must "strictly adhere to all the requirements of this section," subject to a limited exception for certain de minimis violations. *Id.* § 2560.503-1(l)(2), (p)(3). Amazon has not shown that any of the notice deficiencies discussed below falls within that exception.

60. The substantial-compliance standard applied in *Bunner v. Dearborn National Life Insurance Co.*, 37 F.4th 267 (5th Cir. 2022), does not excuse Amazon's noncompliance with the post-2018 notice requirements. Bunner's claim for LTD benefits was initiated and denied in 2017, before the April 1, 2018 applicability date of the provisions requiring disclosure of the calendar expiration date and strict adherence to the disability-claim procedures. *See id.* at 271–72. Thomas's claims, by contrast, were filed in 2019. Thus, *Bunner* does not address the provisions governing Thomas's claims.

61. Amazon has not established compliance with Section 2560.503-1(j)(4)(ii) as to Thomas's first and third injuries. As to the first injury, the evidence establishes that the Committee upheld the denial and that a letter communicating its decision was sent to Thomas, but the letter itself is not contained in Dkt. No. 184-24. The record therefore does not establish that the adverse determination on review disclosed either the contractual limitations period or the calendar date on which that period expired. As to the third injury, the final appeal determination informed Thomas that he could pursue an action under Section 502(a) of ERISA but did not disclose either the Plan's one-year limitations period or its expiration date. (Dkt. No. 184-23 at 2).

62. Before the calendar-date requirement took effect, several courts of appeals held that a plan-imposed limitations period was unenforceable when the required benefit determination failed to disclose that period. *See Santana-Díaz v. Metropolitan Life Insurance Co.*, 816 F.3d 172, 181–85 (1st Cir. 2016); *Mirza v. Insurance Administrator of America, Inc.*, 800 F.3d 129, 135–38 (3d Cir. 2015); *Moyer v. Metropolitan Life Insurance Co.*, 762 F.3d 503, 505–07 (6th Cir. 2014). The Fifth Circuit has also affirmed a judgment declining to enforce contractual limitations provisions where the district court found that the administrator failed to provide required notice, although the appellant abandoned any challenge to that independent ground and the Fifth Circuit therefore did not decide the notice question on its merits. *Encompass Office Solutions, Inc. v. Louisiana Health Service & Indemnity Co.*, 919 F.3d 266, 281–82 (5th Cir. 2019). The Court finds the reasoning of these authorities persuasive and therefore declines to enforce the Plan's one-year limitations period as to Thomas's first and third injuries.

63. Thomas's second injury presents a different, and narrower, question. The adverse determination on review expressly stated that an ERISA action had to be brought within one year of the adverse benefit determination on review. (Dkt. No. 184-21 at 2). It did not, however, state the calendar date on which that period expired, as Section 2560.503-1(j)(4)(ii) expressly requires.

64. The Fifth Circuit has not addressed the consequence of failing to comply specifically with the calendar-date requirement, and the Court has identified no circuit decision resolving that precise question. Nevertheless, the reasoning of *Santana-Díaz*, *Mirza*, and *Moyer* supports declining to enforce the contractual limitations period under the circumstances presented here. By requiring disclosure of both the applicable limitations period *and* "the calendar date on which the contractual limitations period

expires," the Department of Labor treated those disclosures as distinct requirements. 29 C.F.R. § 2560.503-1(j)(4)(ii). Enforcing the contractual period despite omission of the required calendar date would substantially diminish the independent effect of the latter requirement. The Court therefore concludes that the Plan's one-year limitations period is unenforceable as to Thomas's second injury as well.

65. Because the Plan's contractual limitations period is unenforceable as to each of Thomas's three claims, the Court applies Texas's four-year limitations period for breach-of-contract claims.

66. Thomas filed this action on September 15, 2021. (Dkt. No. 1). The final administrative determinations concerning his first, second, and third injuries occurred on March 5, 2020, December 31, 2019, and December 18, 2019, respectively. (Dkt. Nos. 184-24, 184-21, 184-23). Thomas filed suit within four years of each determination. His denial-of-benefits claims are therefore timely.

**2. <u>Substantive Claims</u>**

67. "A claimant under section 1132(a)(1)(B) has the initial burden of demonstrating entitlement to benefits under an ERISA plan, or that denial of benefits under an ERISA plan is arbitrary and capricious." *Krishna v. Nat'l Union Fire Ins. Co.*, 676 F.Supp.3d 494, 502 (S.D. Tex. 2023) (quoting *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 n.9 (5th Cir. 1993)).

68. "Where a benefits plan 'gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan' . . . the reviewing court applies an abuse of discretion standard to the plan administrator's decision to deny benefits." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989)). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Rittinger v. Healthy All. Life Ins. Co.*, 914 F.3d 952, 956 (5th Cir. 2019) (internal quotation marks omitted). The question is not whether the administrator's stated reasoning is "the *best* construction of [the plan]," but whether the "construction was so egregiously wrong that it flouts the plan's plain language and constitutes an abuse of discretion." *Id.* at 957 (emphasis in original). "This is the functional equivalent of arbitrary and capricious review." *Anderson*, 619 F.3d at 512.

69. A decision is arbitrary if it is "made without a rational connection between the known facts and the decision." *Id.* (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)) (internal quotation marks omitted). A benefits determination must also be supported by substantial evidence. *Id.* (citing *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Corry v. Liberty Life Assurance Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007)). This standard requires only that the administrator's decision falls on a continuum of reasonableness, even if on the low end. *Id.* (quoting *Corry*, 499 F.3d at 398). "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail." *Ellis*, 394 F.3d at 273.

70. Article 5.2 of the Plan states:

> The Plan Administrator has the exclusive responsibility for the general administration of the Plan and has the discretionary power and authority necessary to accomplish that purpose including, but not limited to, the following rights, powers, and authorities: (i) to make rules for administering the Plan; (ii) to construe all provisions of the Plan; . . . (iv) to determine all questions relating to eligibility and all other matters relating to entitlement to benefits; (v) to resolve all controversies relating to the administration of the Plan and to ask any questions he believes are advisable for the proper administration of the Plan; (vi) direct the Claims Administrator, if any, in all matters relating to the processing of claims and payment of Plan benefits; (vii) delegate any clerical or recordation duties of the Plan Administrator as the Plan Administrator believes is advisable to properly administer the Plan; (viii) the Plan Administrator (or its delegate) may investigate all accidents, injuries, and illnesses, and promulgate, implement, and enforce workplace safety rules and standards; and (ix) appoint a Claims Administrator to assist with the administration of claims under this plan.

(Dkt. No. 184-2 at 22–23). This language gives Amazon, as Plan Administrator, discretionary authority to construe the Plan and determine eligibility for benefits. The Court therefore reviews the final benefits determinations made under that authority for abuse of discretion. *Anderson*, 619 F.3d at 512.

a. <u>The First Injury</u>

71. The decision to terminate Thomas's disability and medical-expense benefits for his first injury was not an abuse of discretion. The termination letter stated that, based on Dr. Orth's report, Thomas had reached Maximum Rehabilitative Capacity and could return to unrestricted duty. (Dkt. No. 184-18). Dr. Orth's report provided substantial evidence supporting that determination. His report contained findings from his physical examination of Thomas, including his conclusions that Thomas's condition was not traumatic or work-related, that Thomas may have been magnifying his symptoms, and

that his condition reflected age-related degenerative changes. (Dkt. No. 184-12 at 2, 5–7). The report also summarized Thomas's prior medical care and concluded that Thomas had reached "maximum medical improvement," required no further treatment, and could return to unrestricted duty. (*Id*. at 3–8). The Plan Administrator was entitled to credit Dr. Orth's medical opinion even if it differed from the conclusions reached by NLUC. *See Rittinger*, 914 F.3d at 959 ("We have said that, when faced with two competing medical views, a plan administrator may exercise discretion and choose one of them.").

72. Thomas argues that Dr. Orth did not qualify as an "Approved Provider" under the Plan and therefore could not supply the medical determination necessary to terminate his benefits. (*See* Dkt. No. 204 at 12–13). The Plan defines an "Approved Provider" as "a [sic] authorized health care provider approved by the Plan Administrator who is acting within the scope of his or her license or credentials (as applicable) and rendering care or treatment to a Participant for his or her Injury that is appropriate for the conditions and locality." (Dkt. No. 184-2 at 6). Dr. Orth was a licensed orthopedic surgeon qualified to perform an IME, and Perez obtained Amazon's approval before referring Thomas to him. (*See* Dkt. No. 193 at 50–51). Although Thomas selected NLUC from an initial list of Approved Providers that did not include Dr. Orth, (*see* Dkt. No. 185 at 21), nothing in the Plan limited Amazon to those three providers or prevented it from approving an additional provider, (*see generally* Dkt. No. 184-2). To the contrary, the Plan places authority to approve providers with the Plan Administrator.

73. Thomas further argues that Dr. Orth did not meet the Plan's definition of "Approved Provider" because he did not provide "care or treatment." Dr. Orth stated that he "would not become [Thomas's] treating physician or be offering any treatment to him." (Dkt. No. 184-12 at 1). But Dr. Orth did perform a physical examination, review Thomas's medical history, and provide a medical assessment of his condition and ability to return to work. On this record, it was not unreasonable for the Plan Administrator to construe the Plan's reference to "care or treatment" as encompassing that authorized medical evaluation. The Court therefore concludes that treating Dr. Orth as an Approved Provider for purposes of the benefits determination was not an abuse of discretion.

74. Dr. Orth's finding plainly supported the termination of Thomas's medical-expense benefits. Article 4.6 provides that Medical Expense Benefits cease on "[t]he date Maximum Rehabilitative Capacity is achieved." (Dkt. No. 184-2 at 18). The Plan defines Maximum Rehabilitative Capacity as "the earliest date after which, based upon reasonable medical probability, further material recovery from or lasting improvement to an injury can no longer reasonably be anticipated." (*Id*. at 8). Although Dr. Orth used the term "maximum medical improvement" rather than "Maximum Rehabilitative Capacity," he concluded that Thomas required no further treatment and could return to work without restrictions. (Dkt. No. 184-12 at 6–7). Given the Plan's definition, the Plan Administrator reasonably treated Dr. Orth's findings as establishing that Thomas had reached Maximum Rehabilitative Capacity. That medical opinion constitutes substantial evidence supporting the termination of Thomas's medical-expense benefits.

75. The termination of Thomas's disability benefits is a closer call. The termination letter cited Article 4.5 of the Plan, which provides that disability benefits cease "[i]f the Participant is released to return to work, without restriction or to Maximum Rehabilitative Capacity by an Approved Provider, but the Participant does not return to work <u>for any reason</u>." (Dkt. No. 184-18 at 2 (citing Dkt. No. 184-2 at 16)) (emphasis in original). Thomas had been released to unrestricted duty and Maximum Rehabilitative Capacity, but his disability benefits terminated effective July 24, 2019—one day before Amazon instructed him to return to unrestricted work. (Dkt. No. 184-18 at 1); (Dkt. No. 185 at 11). He therefore could not have failed to return to work before his benefits were terminated.

76. That timing discrepancy does not, however, render the benefits determination an abuse of discretion. Article 4.5 separately provides that "Disability Benefits cease on the date the Participant is released from care by an Approved Provider." (Dkt. No. 184-2 at 16). Dr. Orth concluded that Thomas required no further treatment, had reached maximum medical improvement, and could return to unrestricted duty. (Dkt. No. 184-12 at 6–7). The termination letter relied on those conclusions and cited Article 4.5 as the basis for terminating Thomas's disability benefits. (Dkt. No. 184-18). In light of Article 4.5 as a whole and Dr. Orth's medical findings, the determination that Thomas's disability benefits should cease on July 24, 2019, was supported by substantial evidence and fell within the continuum of reasonableness required under abuse-of-discretion review. *Anderson*, 619 F.3d at 512 (quoting *Corry*, 499 F.3d at 398).

b. <u>The Second Injury</u>

77. The decision to deny Thomas benefits for the May 6, 2019, injury was an abuse of discretion. The initial denial stated that Thomas "did not sustain an injury" on May 6 but instead "only increased [his] pain" from his March 18 injury. (Dkt. No. 184-20). The denial relied on the Plan's definitions of "Accident" and "Cumulative Trauma," and the Committee upheld the denial on the ground that the evidence did not establish "a new accident" on May 6. (Dkt. No. 184-21). That reasoning does not comport with the Plan's terms. The Plan does not limit benefits to injuries resulting from an "Accident." Rather, Articles 4.5 and 4.6 expressly provide benefits for qualifying injuries resulting from "an Accident, Occupational Disease *and/or Cumulative Trauma*." (Dkt. No. 184-2 at 15, 17 (emphasis added)). Perez likewise testified that he viewed Thomas's May 6 condition as "more of a cumulative-type problem" and "an exacerbation." (Dkt. No. 193 at 103–05). Yet the benefits determinations treated the absence of a new "Accident" as a basis for denying coverage without adequately accounting for the Plan's separate coverage of Cumulative Trauma. A construction that effectively reads one of the Plan's expressly covered categories out of the relevant benefits provisions does not fall within the permissible range of interpretations afforded under abuse-of-discretion review. *See Rittinger*, 914 F.3d at 957; *Anderson*, 619 F.3d at 512.

78. That conclusion does not, however, entitle Thomas to a monetary recovery under Section 502(a)(1)(B). Thomas bears the burden of establishing benefits due to him under the terms of the Plan. *See Krishna*, 676 F.Supp.3d at 502. He did not prove at trial that any additional benefits remained payable as a result of the May 6 injury. He presented no evidence of medical expenses attributable to that injury that should have been paid under the Plan. And his own evidence showed that he received short-term disability benefits from May 19 through July 25, 2019. (Dkt. No. 185 at 44). Thomas offered no evidence establishing that, had the May 6 claim been properly evaluated, he would have been entitled to disability benefits beyond those he received. Thomas sought other forms of relief in his Complaint, including back pay, front pay, stock holdings, an equitable surcharge, reinstatement of medical and income benefits, and unpaid vacation time. (Dkt. No. 50 at 14). But he presented no evidence at trial establishing an amount recoverable as benefits due under the Plan based on those requests. Because Thomas has not proved that any benefits due under the Plan remain unpaid, the Court awards him no relief under Section 502(a)(1)(B) for his second injury.

c. The Third Injury

79. Finally, the denial of benefits for Thomas's third injury was not an abuse of discretion. The evidence available when the claim was denied provided a rational basis for concluding that Thomas failed to timely report the injury. Article 3.3 of the Plan required a participant to report an Accident generally no later than the end of the shift and, in all events, within three days. (Dkt. No. 184-2 at 11–12). The Plan defines an "Accident" as an injury that, among other things, "occurred at a specifically identifiable time and place." (*Id*. at 5). The record reasonably supported treating May 18, 2019, as the date of Thomas's injury. The Fort Bend Women's Center incident report documenting the May 18 event did not state that Thomas had been injured. (Dkt. No. 185 at 69). Thomas did not report an injury to Amazon until May 29, 2019, when he submitted a FROI stating that "on 5/18/2019 . . . I reinjured my neck, hurt my back, and I am experiencing intense headaches and dizziness more frequently." (Dkt. No. 184-15 at 1). Although Thomas testified that he did not realize he was injured until several days after the incident, (*see* Dkt. No. 193 at 167–71), it was reasonable to conclude from his own FROI that the injury occurred on May 18. Because Thomas did not report that injury until eleven days later, the determination that his claim was untimely had a rational connection to the record and was supported by substantial evidence. *See Anderson*, 619 F.3d at 512.

## B. Failure to Produce Documents

80. ERISA requires a plan administrator, "upon written request of any participant or beneficiary," to furnish a copy of the latest summary plan description and "other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Section 1132(c)(1)(B), in turn, provides that an administrator who fails or refuses to furnish requested information that ERISA requires the administrator to provide within 30 days of the request may, in the Court's discretion, be held personally

liable to the participant for up to $100 per day from the date of the failure or refusal. 29 U.S.C. § 1132(c)(1)(B). The applicable regulation increases the maximum penalty to $110 per day for violations occurring after July 29, 1997. 29 C.F.R. § 2575.502c-1.

81. Section 1132(c) imposes liability on the ERISA "administrator." ERISA defines that term as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(i). Here, the Plan designates Amazon as the Plan Administrator and Anchor as the Claims Administrator. (Dkt. Nos. 184-2 at 7, 10; 184-6 at 25). Accordingly, any liability under Section 1132(c) lies against Amazon, not Anchor. *See Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 486–87 (5th Cir. 2017).

82. Thomas made a written request for the Plan on July 8, 2019. (Dkt. No. 184-25). Specifically, he requested "a complete copy of The Plan rules and policy." (*Id.*). Amazon therefore had 30 days to furnish the Plan, which means it was required to do so no later than August 7, 2019. *See* 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B). On July 30, 2019, Perez emailed Thomas and stated that a copy of the Plan was attached. (Dkt. No. 184-3 at 1). Thomas received the email but testified that he could not view, download, or otherwise access the attachments, including the Plan. (Dkt. No. 193 at 159). The Court finds that testimony credible. To the extent Thomas seeks a Section 1132(c)(1)(B) penalty based solely on Amazon's alleged failure to provide him an SPD during onboarding, he has not shown that he made a written request for the SPD, and the Court awards no penalty on that basis.

83. The Department of Labor's disclosure regulation requires a plan administrator to use "measures reasonably calculated to ensure actual receipt" of materials required to be furnished under ERISA. 29 C.F.R. § 2520.104b-1(b)(1). For materials requested under Section 1024(b)(4), the regulation states that the requested materials "shall be mailed to an address provided by the requesting participant or beneficiary or personally delivered to the participant or beneficiary." *Id.* § 2520.104b-1(b)(2). The regulation also provides conditions under which electronic disclosure is deemed to satisfy the general furnishing requirement in subsection (b)(1). Under that safe harbor, among other requirements, the administrator must take measures reasonably calculated to ensure that the electronic system results in actual receipt of the information. *Id.* § 2520.104b-1(c)(1)(i)(A). The administrator must also establish either that the participant falls within the regulation's workplace-access category or that the participant affirmatively consented to electronic disclosure after receiving the disclosures specified by the regulation. *Id.* § 2520.104b-1(c)(2).

84. The evidence does not establish that the July 30 email satisfied Amazon's disclosure obligation. Amazon neither mailed nor personally delivered the requested Plan as contemplated by Section 2520.104b-1(b)(2) within the 30-day period, nor did Amazon establish that its July 30 email satisfied the regulation's electronic-disclosure safe harbor. In particular, Amazon presented no evidence that Thomas's work duties placed

him within the regulation's workplace-access category, that Thomas affirmatively consented to electronic disclosure after receiving the required consent statement, or that Amazon employed safeguards reasonably calculated to ensure actual receipt of the attached Plan. Although the regulation identifies return-receipt features, notices of undelivered electronic mail, and periodic reviews or surveys as examples rather than mandatory individual measures, Perez used none of those measures or any comparable safeguard and did not follow up to determine whether Thomas could access the attachment. *See id.* § 2520.104b-1(c)(1)(i)(A).

85. Several months later, Thomas informed Perez that he lacked the ability to download and print electronically transmitted documents and requested that the materials be mailed to him in hard copy. (Dkt. No. 185 at 30–31). That later communication does not independently establish that Thomas could not access the July 30 attachment, but it corroborates his credited testimony concerning his inability to access the July 30 attachment. On this record, the Court finds that the July 30 email did not furnish Thomas with the Plan in a manner reasonably calculated to ensure his actual receipt of it. Amazon therefore failed to satisfy Thomas's July 8, 2019, request within the 30 days required by Section 1132(c)(1)(B).

86. Whether to impose a statutory penalty, and in what amount, rests within the Court's discretion. *Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.*, 637 F.2d 357, 362 (5th Cir. 1981). Prejudice is not a prerequisite to an award, but it is a factor the Court may consider in exercising that discretion. *Godwin v. Sun Life Assurance Co. of Canada*, 980 F.2d 323, 327 (5th Cir. 1992). Courts also consider such circumstances as the administrator's bad faith, the length of the delay, the number of requests, the importance of the documents withheld, and the prejudice caused by the failure to disclose. *See Kidder v. Aetna Life Insurance Co.*, No. 5:14-CV-00665, 2016 WL 1241549, at *9 (W.D. Tex. Mar. 28, 2016).

87. The Court concludes that a penalty is warranted. The evidence does not establish that Amazon, acting through Perez, acted in bad faith or intentionally withheld the Plan from Thomas. The failure to furnish the Plan amounted, at most, to negligence. But the delay was substantial, and Amazon's failure to furnish the Plan materially impaired Thomas's ability to understand and challenge the denial of his benefits. In particular, the Plan expressly provides coverage for qualifying Cumulative Trauma, yet the denial of Thomas's second claim relied on reasoning inconsistent with that provision. Without access to the Plan itself, Thomas was placed at a significant disadvantage in challenging that determination administratively.

88. Amazon's 30-day period to comply with Thomas's July 8, 2019, request expired on August 7, 2019. Its statutory noncompliance therefore began on August 8, 2019. It is undisputed that Thomas still had not received the Plan when he filed this action on September 15, 2021. The maximum statutory penalty available for that period substantially exceeds the amount the Court ultimately awards.

89. Considering the absence of bad faith, the length of the delay, the importance of the Plan to Thomas's claims, and the prejudice caused by the failure to furnish it, the Court exercises its discretion to impose a total statutory penalty of $6,050 against Amazon. This award is below the maximum authorized for the established period of noncompliance and reflects the Court's weighing of the aggravating and mitigating circumstances.

90. The Court also awards Thomas post-judgment interest on that amount at the rate prescribed by 28 U.S.C. § 1961(a). *See Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010).

## III. CONCLUSION

Based on the foregoing, the Court finds as follows:

1. Plaintiff has not established that the denial of benefits for his first injury was an abuse of discretion and is therefore not entitled to relief on that claim;

2. Plaintiff has established that the denial of benefits for his second injury was an abuse of discretion, but he has not proved that any additional benefits are due to him under the Plan and is therefore not entitled to a monetary recovery on that claim;

3. Plaintiff has not established that the denial of benefits for his third injury was an abuse of discretion and is therefore not entitled to relief on that claim; and

4. Plaintiff has established that Amazon violated 29 U.S.C. § 1132(c)(1)(B) by failing to timely furnish the Plan and is awarded $6,050 in statutory penalties against Amazon, together with post-judgment interest at the rate prescribed by 28 U.S.C. § 1961(a). Plaintiff takes nothing against Anchor on this claim.

The Court will enter a separate final judgment to this effect.

It is SO ORDERED.

Signed on September 29, 2026.

Drew B Tipton

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**